UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBORAH SCOTT,

    Plaintiff,

v.

TOTAL RENAL CARE, INC., ET AL.,

    Defendants.
    _____/

Case No. 04-71700

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [24]**

Plaintiff, a former at-will employee at Defendant DaVita's North Oakland Dialysis Facility, alleges that her employment was wrongfully terminated for retaliatory reasons in violation of Michigan's Whistleblowers Protection Act, Mich. Comp. Laws § 15.361, *et seq.*, public policy, and the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et seq.* This Court has diversity jurisdiction over Plaintiff's claims.

This matter comes before the Court on Defendants' motion for summary judgment. For the reasons stated more fully below, this Court GRANTS Defendants' motion for summary judgment.

**I.    Facts**

Plaintiff, a social worker, was an "at will" employee at Defendant DaVita's North Oakland Dialysis Facility ("DaVita Facility") in Pontiac, Michigan, from 1996 to February 5,

2004. Defendant DaVita, Inc. owns and operates kidney dialysis treatment centers throughout the United States.[1]

On October 27, 2003, Geraldo Todd, R.N., was appointed Facility Administrator and became Plaintiff's immediate supervisor. (Todd Dep. at 11.) He had responsibility for hiring and firing of DaVita Facility employees. (Todd Dep. at 15.)

### A. Plaintiff's Complaint to State Agency About Facility

In or around November 2003, Plaintiff testified that she made a complaint to someone in a State agency by calling a toll free number that was posted at the DaVita Facility and was also in her Rolodex. She complained to the woman who answered about "staffing irregularities" such as inadequate and inaccurate reporting of staffing and high staff turnover that she felt affected patient safety. Plaintiff also complained about "charting irregularities" such as long-term care plans were not done as often as required. (Scott Dep. at 239-263.) She further notified the State that specific patients had complaints as well. (*Id.* at 248-49.)

In either November or December 2003 or January 2004, and every time State auditors were at the DaVita Facility, Plaintiff testified that she made similar complaints about "short staffing, charting issues, turnover in staff," the hiring of inexperienced replacements for technicians, and "scheduling irregularities." (*Id.* at 239, 265-82.)

### B. Complaints About Racial Discrimination in Hiring At Facility

Also in November or December 2003, Plaintiff testified that a patient, Elmer Cordell, told her that he thought it was unusual for the DaVita Facility to hire six new employees

---

[1] Prior to 2000, DaVita conducted business under the name of Total Renal Care, Inc. DaVita and its corporate predecessors are herein collectively referred to as Defendants.

who were all black and inexperienced. (Scott Dep. at 294-95, 304.) Plaintiff "overheard" several of these new hires say that they were hired by Mr. Todd. (Scott Dep. at 302.) She also testified that she spoke to Marty Konal, DaVita's Regional Director, about the patients' concern that these new employees were all black and inexperienced, told him that the staff had also asked questions about these new hires, and "alluded" that this could possibly be racial discrimination and a violation of the law. (*Id.* at 305, 316-19.) Plaintiff does not know if Mr. Konal told Mr. Todd about her concerns. (*Id.* at 321.) Mr. Todd testified that he was not informed about Plaintiff's concerns about possible racial discrimination in his hiring practices. (Todd Dep. at 78.)

Mr. Konal testified that Plaintiff complained to him about Mr. Todd not long after he was hired on October 27, 2003. She told him that she felt that Mr. Todd was terminating the white employees and hiring all blacks, and that he was favoring the black race in general. (Konal Dep. at 99-100.) Mr. Konal told Plaintiff that he would look into her complaints, did so, and was not concerned because the staff was predominately white while the patients were 70 percent African American, and determined that a diverse staff was beneficial. (*Id.* at 100-01.)

Plaintiff also discussed the circumstances of these new hires with another employee and the two of them decided to put something in writing. Plaintiff and this other employee felt that Mr. Todd was breaking the law because the employees leaving DaVita were mostly white and the new employees were black. (Scott Dep. at 306, 320.) Plaintiff testified repeatedly that she believed the fact that each of the six new hires were black and inexperienced created "a possibility of racial discrimination" by Mr. Todd. (*Id.* at 306, 311, 313-14, 353-54, 405.)

3

Plaintiff further testified that she met with Mary Nixon, the Facility's Human Resources person, in late January, 2004. Linda Aikins, a unit secretary; Marietta Kroll, a dietician; and an R.N. by the name of Leane also participated in this meeting. Numerous concerns were voiced by all. Plaintiff testified that she discussed her concern about the hiring of six black, inexperienced employees and the patients' fear about their safety, as well as her concerns about short staffing and scheduling irregularities. (Scott Dep. at 325-27.) Plaintiff testified that she did not know whether Mary Nixon subsequently met with Regional Vice President Greg Hartmann to discuss the concerns raised in this meeting. (*Id.* at 335-36.)

Ms. Nixon testified that she recalled meeting with Plaintiff, Marietta Kroll, and Linda Aikins on January 29, 2004 where concerns regarding insufficient staffing, bonus payouts, and discrimination in the assignment of clerical duties were discussed. An R.N. by the name of Leane also joined them for a brief time. She does not recall any discussion about Mr. Todd and racially discriminatory hiring practices. (Nixon Dep. at 28-32.) Ms. Nixon never mentioned to Mr. Todd the names of employees who met with her or discussed their concerns with him. (Nixon Dep. at 40.) Mr. Todd testified that he was never informed about any complaints accusing him of engaging in racially discriminating hiring practices. (Todd Dep. at 78, 80-82.) Ms. Nixon did discuss the concerns raised at the January 29, 2004 meeting generally with Mr. Konal. (Nixon Dep. at 40-41.)

Plaintiff testified that Mr. Hartmann visited the DaVita Facility a few days after Ms. Nixon's late January 2004 visit. Plaintiff assumed, but had no knowledge that, his visit was in response to a complaint by a patient and her spouse. These individuals told Plaintiff that they had complained to Mr. Hartmann and had asked him to come to the DaVita Facility before they left on vacation on February 1, 2004. (*Id.* at 336-38.) Mr. Hartmann testified

4

that he did recall that Mr. Sheehy, a patient's husband, had complained to him about the fact that his wife's new caregiver at the DaVita Facility was of a different race than her prior caregiver. He could not, however, speculate what the husband was thinking when he made this complaint. (Hartmann Dep. at 77, 102-04.) He further testified that he did not recall ever meeting Plaintiff, the purpose for the DaVita Facility visit, or any complaints of racial discrimination made by DaVita Facility employees. (*Id.* at 75-77, 102.)

Mr. Konal also testified that Mr. Hartmann told him that he had received a complaint from Mr. Sheehy about new employees that Mr. Sheehy felt were less experienced than the employees they replaced and stated his concern about his wife's current care. (Konal Dep. at 57-60, 62.) Mr. Todd also informed Mr. Konal that he too had had a conversation with the Sheehys expressing these same concerns. (Konal Dep. at 60.) Mr. Konal also learned that the Sheehys also spoke with Christine LeBow, who was Mr. Todd's immediate supervisor. (*Id.* at 61.)

Mr. Konal also learned that Mr. Hartmann received a second call from Mr. Sheehy, stating once again that he was still not comfortable with the level of experience of the new employees. (*Id.* at 64-65.) Mr. Konal went back to Ms. LeBow and Mr. Todd. Ms. LeBow agreed to meet with Mr. Sheehy. Mr. Todd told Mr. Konal that Mr. Sheehy loudly remarked in the treatment room, in front of staff and patients, that "I don't want these blacks taking care of my wife." (*Id.* at 65.)

Mr. Konal does not recall discussing the Sheehys' concerns with Plaintiff, did not direct either Ms. LeBow or Mr. Todd to discuss them with Plaintiff, and did not know if the Sheehys discussed their concerns with Plaintiff even though he assumed they had. (*Id.* at 68-69.)

5

## C. State Unannounced Visit to DaVita Facility in January 2004

On January 16-18, 2004, there was an unannounced visit to the Facility by the State. Mr. Konal testified that he was told it was the result of a patient complaint and assumed that it was the Sheehys. (Konal Dep. at 70.) Mr. Todd was out of the office for training in California. (Todd Dep. at 47-48, 50.) Mr. Konal got a call from the Facility, telling him that the State was there for an audit. He went to the Facility because Mr. Todd was out of town, stayed there about an hour, saw that the fill-in administrator had things under control and left. He called Mr. Hartmann and told him that the State was at the Facility based on a complaint. Mr. Hartmann did not appear upset by this information. (Konal Dep. at 71-72.)

At the exit interview with the State, Mr. Konal learned that some citations had been issued; i.e., lack of documentation regarding long-term care and insufficient staffing. (*Id.* at 70, 72.) Mr. Konal was not upset over this because he felt the citation about staffing was unwarranted and the citations regarding documentation could be easily fixed. (Konal Dep. at 73-74.)

Mr. Todd, who was in California at the time of the State audit, testified that he understood that the State came to the DaVita Facility in response to a complaint by a patient, but was not informed about the nature of the complaint. (Todd Dep. at 47, 48, 50, 55-57, 65-66.) He learned about the State visit from his Clinical Coordinator, Marcia Schweisthal, who phoned him in California. (Todd Dep. at 48-49.) Mr. Todd testified that he learned about the nature of the citations issued as a result of that State audit when he received written notice of them in late February 2004. (Todd Dep. at 59-60, 62, 65-66.)

On February 27, 2004, Mr. Todd received a letter from the State of Michigan, Department of Health. The letter stated that "[p]articipation in the Medicare program

6

requires that an End-Stage Renal Disease (ESRD) facility meet all provisions of Section 1819 of the Social Security Act and be in compliance with all Conditions of Coverage found in 42 CFR, Part 405." It further advised Mr. Todd that a complaint investigation was conducted at his Facility on January 14-26, 2004, enclosed the CMS-2567, Statement of Deficiencies and Plan of Correction, and notified him that the Facility was not in compliance with a condition of coverage for ESRDs; i.e., "405.2162 Staff of a Renal Dialysis Facility. (Pl.'s Ex. C.) The letter further advised that termination of the Facility's participation in the Medicare program was being recommended, "effective 90 days from the date of this correspondence", and that "[t]he 90-day termination process affords an opportunity to make corrections and achieve compliance", and that a plan of correction must be submitted by March 8, 2004. (*Id.*)

Ms. Aikins, a unit secretary at DaVita, testified that she believed the Facility was "turned in" by a patient and "got busted" in part because there were missing papers in the charts. She testified that, after the state audit, she tried to explain that she could not file papers in the charts that were not signed, and felt that Mr. Todd was blaming her for the deficiencies the State found. Specifically, she testified that:

> I'm getting blamed for everything that's not done in a secretarial filing unit, and this was a state survey. They were turned in by a patient, and when the state came in, there was missing papers in the charts, and I tried to explain, they're not signed, they can't go in the charts. . . . But when Geraldo [Todd] come back from his trip, he said someone had to take the blame and it was me.

(Aikins Dep. at 104-05.) Ms. Aikins further testified that she was not in the office during the State audit but was told that it was a patient complaint that prompted the unannounced visit. (Aikins Dep. at 139-40.)

**D. Plaintiff's February 5, 2004 Termination**

7

In the morning on February 5, 2004, Mr. Todd called Plaintiff into his office. He testified that the meeting was precipitated by a letter Plaintiff sent to Renal Network 11 without his knowledge or authorization.[2] (Defs.' Ex. 3, Scott 1/28/04 letter to Renal Network 11 re: Sept.-Oct. 2003 Missing Data 2728 form.) Mr. Todd found the letter in his work mail slot either late on February 4, 2004 or early in the morning on February 5, 2004, and felt it was important to discuss the letter with Plaintiff. (Todd Dep. at 92-94.) The letter essentially blamed a DaVita secretary, Kris Clark, for the failure to timely provide certain required data. (Defs. Ex. 3, Scott 1/28/04 letter.) Mr. Todd felt that Plaintiff should not have written to an outside entity, identifying and placing blame on a co-worker, without first bringing the matter to his attention, as Facility Administrator, and giving him the opportunity to resolve the matter internally. (Todd Dep. at 92-96, 100-02.) He testified that the point of the February 5, 2004 meeting was to facilitate a process to resolve the concerns raised in and by Plaintiff's letter and to stress the importance of all DaVita Facility employees working as a team. (Todd Dep. at 101.) Instead, the meeting became heated, with Plaintiff accusing Ms. Clark of lying, and Plaintiff and Mr. Todd telling each other that they were being offensive. (Todd Dep. at 103-115; Defs.' Ex. 5, Todd contemporaneous memo to file.) Plaintiff announced that those present at the meeting were "out to get her" and she threatened to sue Mr. Todd. (Defs.' Ex. 5, Todd contemporaneous memo to file.) Plaintiff abruptly ended the meeting, and despite Mr. Todd's request not to leave, she did so. (*Id.*) Mr. Todd's contemporaneous notes reflect that he informed Plaintiff several times that if

---

[2]Renal Network 11 is a private, non-profit corporation that, among other services, coordinates communication and collection of data from its member renal treatment facilities for Medicare survey and reporting purposes. (Defs.' Ex. 4, download from Renal Network's website, www.esrdtnet11.org; Ex. 4, Scott Dep. at 225-28.)

8

she left the Facility for the day, he would view that as job abandonment, that Plaintiff then informed him that she was ill and was leaving although Plaintiff did not appear to be ill, that he once again informed her that if she left he would consider it job abandonment, and Plaintiff subsequently left the building. (*Id.*; Todd Dep. at 101-110.)

The Facility's Clinical Coordinator, Marsha Schweisthal, an R.N., was also present at the meeting at Mr. Todd's request. (Todd Dep. at 101; Defs.' Ex. 6, Schweisthal Aff. at ¶ 4.) Ms. Schweisthal avers that it was Mr. Todd's practice to have a witness present when he met with individual employees to discuss performance improvement or disciplinary issues. (Schweisthal Aff. at ¶ 4.) Ms. Schweisthal further averred that during the meeting, Mr. Todd attempted to discuss Plaintiff's letter to Renal Network 11 on DaVita stationery blaming unit secretary Kris Clark for the facility's failure to provide certain information in a timely manner. Mr. Todd also attempted to discuss a memo Plaintiff had written to the unit administrative assistant, Raquel Goldsmith, pertaining to the same matter. Mr. Todd tried to explain to Plaintiff that she should have spoken to him first, that she had violated the proper chain of command, and that her actions had been unacceptably disrespectful to a co-worker. (Schweisthal Aff. at ¶ 5.) Plaintiff was resistant to everything that Mr. Todd said, told him that his comments were offensive, and refused to acknowledge that she had done anything wrong, and kept trying to change the subject to criticize Ms. Clark. (*Id.* at ¶ 6.)

Kristin Clark subsequently was asked to join this meeting because it involved her. (Defs.' Ex. 7, Clark Aff. at ¶ 4; Schweisthal Aff. at ¶ 7; Todd Dep. at 102.) After Ms. Clark joined the meeting, it became even more acrimonious. (Schweisthal Aff. at ¶ 7.) At one point, Plaintiff accused Ms. Clark of lying, and Mr. Todd informed her that calling Ms. Clark

9

a liar was very offensive. (*Id.*) Ms. Clark corroborates this testimony. She avers that when Mr. Todd and Ms. Schweisthal tried to explain to Plaintiff why the letter to Renal Network 11 was improper, Plaintiff denied she had done anything wrong and called Ms. Clark a liar. (Clark Aff. at ¶ 4.)

Plaintiff then said she was leaving despite Mr. Todd's response that they were not finished. (Schweisthal Aff. at ¶ 8.) Plaintiff got up and said she was going to file a grievance and a lawsuit and began to leave. Mr. Todd and Ms. Schweisthal followed Plaintiff down the hall. Plaintiff said, "I'm ill, I'm going home," although she had not previously appeared to be ill or said that she was. (*Id.* at ¶¶ 9-10.)

Mr. Todd told Plaintiff that if she left before he was finished with what he had to say to her, he would consider her to have abandoned her job. Mr. Todd repeated this two more times as he followed Plaintiff down the hallway to her office. Plaintiff closed the door in Mr. Todd's face. Plaintiff came out about 10 minutes later and left the building. (*Id.* at 10.) At Mr. Todd's request, Ms. Schweisthal wrote a contemporaneous statement of what occurred at the February 5, 2004 meeting. (*Id.* at 11, Tab A.)

Plaintiff presents a different version of this meeting. Plaintiff recalls the February 5, 2004 meeting but does not recall the letter being discussed. Rather, she recalls a discussion about delegating work back to the secretaries. Plaintiff testified that she felt Mr. Todd was confrontational by saying that she was not a team player. When she realized the meeting was over other issues, Plaintiff testified that she told Mr. Todd that she wasn't going to sit there and be abused, got up, and left. Mr. Todd objected to her leaving. Plaintiff reminded him that she was ill, having told him earlier in the meeting that she was ill that day but still had come into work. As she went down the hall, she testified that Mr.

Todd followed her and threatened her that she had to come back and talk to him. Plaintiff left and did not resume her discussion with Mr. Todd. (Scott Dep. at 229-336.)

After Plaintiff left the building, Mr. Todd called his supervisor, Marty Konal, DaVita Regional Director, in Brighton, Michigan, and reported what had happened and informed him of his decision to terminate Plaintiff's employment for job abandonment. Mr. Konal, suggested that they call and consult with DaVita's Regional People Services [Human Resources] Manager, Mary Nixon, and they did so. Ms. Nixon then convened a conference call with Messrs. Todd, Konal, herself, her supervisor, Suzanne Mauro, and DaVita Associate General Counsel Steven Cooper. Mr. Todd reported what had happened at the meeting with Plaintiff, his warnings about job abandonment, and his decision to terminate Plaintiff. All participants in the phone call concurred with Mr. Todd's decision. (Todd Dep. at 182-88; Nixon Dep. at 27-28, 30, 50, 56-57, 59, 76-81; Konal Dep. at 74-84.)

Mr. Todd then prepared a letter to Plaintiff informing her that she had been terminated, effective immediately, for job abandonment and sent it to Plaintiff by certified mail, return receipt requested. (Todd Dep. at 188; Defs.' Ex. 12, 2/5/04 letter from Todd to Plaintiff.) Before the end of the work day, Mr. Todd called an impromptu staff meeting at the nursing desk and informed all present employees, without explanation, that Plaintiff was no longer a DaVita "teammate" and that she was to be denied access to the Facility and all confidential business and patient information. (Todd Dep. at 165-66, 171-74, 188.) Plaintiff testified that over the weekend, a co-worker had called her and informed her that Mr. Todd had announced on February 5, 2004, that she was no longer a DaVita employee. (Scott Dep. at 366-67, 370-73.)

Mr. Todd subsequently generated a Personnel Change Notice (PCN) on the computer, commenting that Plaintiff was terminated for job abandonment. The PCN form indicates that the termination action was approved, without comment, by Mr. Konal, Ms. Nixon, and Mr. Hartmann. (Pl.'s Ex. A, PCN form.)

On February 10, 2004, Plaintiff faxed to Mr. Todd a handwritten request for her paycheck and two notes from her doctor, authorizing her absence from work for Thursday and Friday, February 5th and 6th, 2004 and for Monday and Tuesday, February 9th and 10th, 2004. (Pl.'s Ex. I, 2/10/04 fax to Todd.) Mr. Todd wrote another letter to Plaintiff, reminding her that she was no longer a DaVita employee, that there was no need for her to fax in doctor notes, and enclosing her requested paycheck. (Todd Dep. at 190.)

Plaintiff subsequently filed this lawsuit on May 5, 2004.

## II.  Standard for Summary Judgment

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue

for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III.  Analysis

This matter is presently before the Court on Defendants' motion for summary judgment arguing that Plaintiff has not presented evidence showing that a genuine issue of material fact exists on her claims that Defendants' termination of her employment violated Michigan's Whistleblower Protection Act, public policy, and the Elliott-Larsen Civil Rights Act. Each of these claims is addressed below.

**A.  Alleged Violation of Michigan's Whistleblower's Protection Act**

To establish a *prima facie* case under Michigan's Whistleblower's Protection Act ("WPA"), Mich. Comp. Laws § 15.362, a plaintiff must show: (1) that she was engaged in protected activity, (2) that the defendant terminated her employment, and (3) "a causal connection exists between the protected activity and the discharge." *Chandler v. Dowell Schlumberger, Inc.*, 572 N.W.2d 210, 212 (Mich. 1998)). To prove causation, Michigan law requires a plaintiff to show that the defendant had "objective notice of a report or threat to report by the whistleblower." *Roberson v. Occupational Health Centers of America,* Inc., 559 N.W.2d 86, 88 (Mich. Ct. App. 1996) (quoting *Kaufman & Payton, P.C. v. Nikkila*, 503

N.W.2d 728, 732 (Mich. Ct. App. 1993). "Protected activity" includes: "(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Phinney v. Permutter*, 564 N.W.2d 532, 554 (Mich. Ct. App. 1997) (citing Mich. Comp. Laws § 15.362).

Once the plaintiff establishes her *prima facie* case, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Phinney,* 564 N.W.2d at 555-56. After the defendant satisfies this burden, the plaintiff must come forward with evidence showing that the defendant's proffered reason is merely a pretext for unlawful retaliation. *Id.*

Plaintiff presents evidence on the first element of her Whistleblower claim. In her deposition, she testified that she made a verbal complaint to a State agency by calling a 1-800 number posted at her workplace for that purpose and complained about insufficient staffing at the DaVita Facility and her concern that this affected patient safety and possibly violated applicable regulatory laws. (Scott Dep. at 239-63.) Despite Defendants' claims to the contrary, Plaintiff's deposition testimony is evidence of conduct that falls within the Act's definition of "protected activity." Plaintiff's similar complaints to Mr. Konal and Ms. Nixon, however, are not protected activity. Reporting to an employer without stating an intent to report to a public body is not protected activity. *Chandler*, 572 N.W.2d at 214-15.

As to the remaining elements in Plaintiff's *prima facie* case, Defendants do not dispute that she was discharged. Defendants do, however, dispute that Plaintiff has presented admissible evidence showing that a genuine issue of material fact exists as to the requisite causal connection between Plaintiff's protected activity and her discharge. Specifically,

14

Defendants argue that Plaintiff has not presented admissible evidence showing that Defendants had objective notice of her verbal complaint to State officials. This Court agrees with Defendants.

Plaintiff claims that her complaint triggered an unannounced visit to the Facility by State auditors, citations against the facility, and her termination. The unrefuted evidence presented here, however, is that a patient and her husband made staffing-related complaints to state regulators, that Defendants' employees all assumed that the January 2004 state audit was triggered by a patient's complaint, and all were unaware of Plaintiff's verbal complaint to state regulators. (Todd Dep. at 47-48, 50, 55, 65-66; Aikins Dep. at 104, 139; Konal Dep. at 70; Schweisthal Aff. at ¶¶ 13, 16; Clark Aff. at ¶ 7.) Plaintiff has not presented admissible evidence that allows a reasonable inference that Defendants had objective notice that she had reported her complaint about inadequate staffing to state regulators. *See Roberson*, 559 N.W.2d at 88 (finding that the plaintiff's statements to her manager, that if she failed to do something about the mice she would report it to OSHA, fell "short of giving her employer notice of a report or a threat to report the deplorable conditions of the building.").

Moreover, Plaintiff cannot rely solely on the timing of her verbal complaint in November or December of 2004 and her subsequent discharge on February 5, 2004 to defeat Defendants' motion for summary judgment. As observed by the Michigan Supreme Court in a similar Whistleblower case:

> To prevail, plaintiff had to show that his employer took adverse employment action *because of* plaintiff's protected activity, but plaintiff has merely shown that his employer disciplined him *after* the protected activity occurred. Plaintiff had to demonstrate that the adverse employment action was in some manner influenced by the protected activity, but has failed to make such a demonstration.

*West v. Gen. Motors Corp.*, 665 N.W.2d 468, 472 (Mich. 2003). Similarly, Plaintiff here has merely shown that she was discharged *after* her protected activity. She fails, however, to present any evidence showing that she was discharged *because of* her protected activity or that her discharge was in some manner influenced by her protected activity.

Plaintiff's attempt to use the deposition testimony of unit secretary Linda Aikins, to establish the required causal connection likewise fails. Ms. Aikins testified that, after the January 2004 state audit was completed and Mr. Todd returned from training in California, he was upset with her and blamed her, not Plaintiff, for documentation deficiencies found by the state auditors. (Aikins Dep. at 104-05.) This testimony does not give rise to a reasonable inference that Plaintiff was discharged *because* Defendants had objective notice of and sought to retaliate against Plaintiff for engaging in protected activity.

There is no evidence that connects Plaintiff's protected activity with her discharge and the mere fact that she was discharged *after* she made a verbal complaint is insufficient. "Something more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed."[3] *West*, 665 N.W.2d at 473. Plaintiff's unsupported assumptions that she could have been discharged because of her protected activity are nothing more than pure conjecture and speculation (Scott Dep. at 287-91, 392) and as such are insufficient to satisfy the required causal connection element of her Whistleblower claim. *See id.* at 474.

Plaintiff failed to present any evidence showing that Defendants had objective notice

---

[3]As observed by the *West* Court, "Plaintiff's whistleblower claim is analogous to an antiretaliation claim based on other prohibited kinds of employment discrimination." *West*, 665 N.W.2d at 473, n.11.

16

that she had made a complaint about the Facility to state regulators and thus cannot establish the causation element of her WPA claim. Accordingly, Plaintiff's WPA claim is dismissed.[4]

### B. Alleged Violation of Michigan Public Policy

Michigan law recognizes that, although an at-will employee cannot generally bring an action for wrongful termination, "some grounds for discharging an employee are so contrary to public policy as to be actionable." *Dudewicz v. Norris-Schmid, Inc.*, 503 N.W.2d 645, 650 (Mich. 1993) (quotation and citation omitted). Where a statute specifically proscribes retaliatory discharge based on the conduct at issue, however, "Michigan courts have consistently denied a public policy claim." *Id.* (citation omitted).

Here, the WPA makes it unlawful for an employer to discharge an employee in retaliation for engaging in protected activity. When the plaintiff's claim falls within the protection of the WPA, she cannot sustain a public policy tort claim for the same alleged wrongful conduct. *See id.* Contrary to Plaintiff's arguments here, the test is not whether the plaintiff can successfully prove the elements of her WPA claim. Rather, it is whether the alleged underlying conduct, if proven, falls within the protection of the WPA. That test is met here.

Similar to the plaintiff in *Parent v. Mount Clemens General Hospital*, No. 235235, 2003 WL 21871745 (Mich. Ct. App. Aug. 7, 2003), Plaintiff "argues that an action for wrongful discharge based upon public policy is sustainable in light of [provisions] of [Michigan's]

---

[4]In light of this conclusion, it is unnecessary to address Defendants' additional arguments that it proffered a legitimate, non-discriminatory reason for Plaintiff's discharge and Plaintiff failed to present evidence showing the proffered reason was a pretext for unlawful retaliation.

Public Health Code. . . ." (Pl.'s Resp. at 15.) As observed by the Michigan Court of Appeals, "plaintiff's exclusive remedy for any alleged wrongful discharge predicated on the policies embodied in [the Public Health Code] is to pursue a claim under the WPA. Plaintiff may not maintain an independent action grounded on public policy arising from the Public Health Code apart from the WPA." *Id.* at 2003 WL 21871745, \*3.

### C. Alleged Violation of ELCRA

Plaintiff also claims that she was unlawfully discharged for making allegations of possible race discrimination against Mr. Todd. (Am. Compl. ¶ 38.) Defendants argue that Plaintiff cannot establish a *prima facie* case of retaliation under Michigan's ELCRA and thus her retaliation claims must be dismissed. This Court agrees.

To establish a *prima facie* case of retaliation, Plaintiff must show "(1) that she was engaged in protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Barrett v. Kirtland Comm. College,* 628 N.W.2d 63, 70 (Mich. Ct. App. 2001).

It is the fourth element that Defendants claim Plaintiff cannot establish; i.e., Plaintiff presents no admissible evidence showing that a genuine issue of material fact exists as to the causal connection between her internal complaints of possible racially discriminatory hiring practices and her discharge. This Court agrees.

"To establish causation, the plaintiff must show that [her] participation in activity protected by the [ELCRA] was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Id.* (citing *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.,* 176 F.3d 921, 929 (6th Cir. 1999); *Polk*

18

*v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 199 (6th Cir. 1986)). "In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Allen v. Mich. Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999).

Plaintiff attempts to establish causation by relying solely on the proximity in time between her November 2003, December 2003, and January 2004 complaints about possible racial discrimination and her February 5, 2004 discharge. In a similar retaliation case, the Sixth Circuit rejected an argument like Plaintiff's that "temporal proximity between the protected activity and the adverse action, in and of itself, is sufficient to establish a causal connection." *Nguyen v. City of Cleveland*, 229 F.3d 559, 565-67 (6th Cir. 2000). The Michigan Supreme Court has similarly held that "Plaintiff must show something more than merely a coincidence in time between protected activity and adverse employment action." *West*, 665 N.W.2d at 473. Moreover, Plaintiff's unsupported assumptions that it was a possibility that she could have been discharged because of her complaints about Mr. Todd's possible racial discrimination are nothing more than pure conjecture and speculation (Scott Dep. at 320-22, 332-36) and as such are insufficient to satisfy the required causal connection element of her ELCRA claim.[5] Accordingly, Plaintiff's ELCRA claims are also dismissed.

## IV.   Conclusion

---

[5] In light of this conclusion, it is unnecessary to address Defendants' additional arguments that it proffered a legitimate, non-discriminatory reason for Plaintiff's discharge and Plaintiff failed to present evidence showing the proffered reason was a pretext for unlawful retaliation.

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

The claims in Plaintiff's complaint are dismissed.


        s/Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated: July 19, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 19, 2005, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager